## COMMONWEALTH vs. CHRISTIAN ALMONTE.

Essex. January 11, 2013. - May 20, 2013.

Present: SPINA, CORDY, BOTSFORD, GANTS, & DUFFLY, JJ.

*Homicide. Motor Vehicle,* Theft. *Practice, Criminal,* Motion to suppress, Warrant, Affidavit, Opening statement, Witness, Argument by prosecutor, Impeachment by prior conviction, Required finding, Capital case. *Evidence,* Argument by prosecutor, Expert opinion, Unresponsive answer, Prior conviction, Death certificate. *Constitutional Law,* Search and seizure. *Search and Seizure,* Warrant, Affidavit. *Witness,* Expert, Impeachment. *Deoxyribonucleic Acid.*

A Superior Court judge properly denied, in part, a criminal defendant's pretrial motion to suppress evidence (including a bloody sock) discovered in his apartment during a search conducted pursuant to a warrant, where the warrant application and accompanying affidavit demonstrated probable cause to search for evidence of an armed robbery that was the subject of a separate investigation from the investigation of a homicide (although the affidavit failed to show a sufficient nexus between the defendant or his apartment and the homicide), in that the robbery was under investigation by police and was specifically referred to in the affidavit, and the scope of items for which the warrant was sought included items that were clearly connected to a robbery at gunpoint rather than a homicide by stabbing [230-234]; and where, as to the bloody sock, the failure to hold an evidentiary hearing did not prejudice the defendant [234-235].

At a criminal trial, there was no impropriety in the prosecutor's remark in his opening statement that the defendant murdered the victim, where the remark was not an expression of personal opinion but rather a summary of the Commonwealth's thesis in prosecuting the case; moreover, the judge's instructions would have cured any possible misunderstanding of the challenged statement. [235-236]

At a murder trial, no substantial likelihood of a miscarriage of justice arose from an analyst's unobjected-to but nonresponsive answer regarding inconclusive deoxyribonucleic acid test results, including the comment that the results "could go either way" in relation to the victim's inclusion in the sample. [238-239]

At a murder trial, the prosecutor's unobjected-to improper remark concerning inconclusive deoxyribonucleic acid test results did not create a substantial likelihood of a miscarriage of justice. [239-240]

This court declined a murder defendant's invitation to abandon its longstanding limitation on the type of admissible evidence of untruthful character and to adopt in substance the rule set out in Fed. R. Evid. 608(b). [240-242]

At a murder trial, there was no error in the admission of an unredacted death

certificate listing the manner of death as homicide and describing the
means of death as stabbing by another, where, although the preferred
practice is to redact the means and manner of death before admitting a
death certificate in evidence, there was no dispute that the victim's death
was a homicide. [242]
At the trial of an indictment charging murder in the first degree, the evidence
was sufficient to sustain the defendant's conviction. [242-243]


INDICTMENTS found and returned in the Superior Court Depart-
ment on June 20, 2008.

A pretrial motion to suppress evidence was heard by *David
A. Lowy*, J., and the cases were tried before him.

*James E. Methe* for the defendant.

*Kenneth E. Steinfield*, Assistant District Attorney, for the
Commonwealth.

BOTSFORD, J. A Superior Court jury convicted the defendant
of murder in the first degree on the theories of deliberate
premeditation and extreme atrocity or cruelty, and of larceny of
a motor vehicle. In this direct appeal from his convictions, the
defendant argues: (1) the partial denial of the defendant's mo-
tion to suppress evidence seized during a search of his apart-
ment was error; (2) the prosecutor included improper remarks
in his opening statement and closing argument; (3) the trial
judge erred in refusing to strike a nonresponsive and prejudicial
answer by a Commonwealth witness concerning the meaning of
"inconclusive" deoxyribonucleic acid (DNA) test results;
(4) the judge's refusal to allow the defendant's counsel to cross-
examine a witness about specific acts of prior misconduct was
error; (5) evidence that the death was a "homicide" should not
have been introduced, as stated either on the death certificate or
in the medical examiner's testimony; and (6) the denial of the
defendant's motion for a required finding of not guilty constituted
error depriving the defendant of his right to due process. The
defendant further argues that relief is warranted pursuant to
G. L. c. 278, § 33E. For the reasons discussed below, we affirm
the defendant's convictions and, with respect to the conviction
of murder in the first degree, decline to exercise our power to
grant relief under G. L. c. 278, § 33E.

*Background.* On February 24, 2008, William Escobar was

stabbed to death in his apartment in Methuen. The police, as part of their investigation, obtained and executed a search warrant for the defendant's apartment in North Andover, and seized from there various personal items, including several articles of the defendant's clothing. In June of 2008, an Essex County grand jury indicted the defendant for murder in the first degree and larceny of a motor vehicle. The defendant moved to suppress the physical evidence seized from his apartment, and a judge in the Superior Court — ultimately the trial judge — denied the motion in part and allowed it in part. After a jury trial in April of 2009, the defendant was convicted of both charges. The defendant filed a timely notice of appeal in this court.

Because the defendant includes a challenge to the sufficiency of the evidence, we recite the facts in the light most favorable to the Commonwealth, see *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979), reserving certain details for our discussion of the issues raised. The victim was forty-two years old and lived with his roommate, Alberto Gil, in a two-bedroom apartment in Methuen. The defendant, who was then twenty-five years old, had grown up in and around Lawrence and met the victim through a friend in 1998 or 1999, when he was about sixteen. Within the next few years, the defendant began a sexual relationship with the victim that continued over a two- to four-year period, ending when the defendant "was away" from the Lawrence area.[1] The defendant returned to the area in December of 2007, and between December, 2007, and February, 2008, the defendant was one of several young men who frequently visited the victim at his apartment, playing dominoes and watching pornographic films in the victim's bedroom. A number of these young men, including the defendant, would spend the night at the victim's apartment.

John Pagan was one of the young men who frequently visited the victim, and during the months before the victim's death, Pagan spent almost every weekend with the victim. During these visits, Pagan and the victim watched pornographic films and masturbated. At some point before the victim's death, Pagan

---

[1]The defendant's absence was a result of his serving a four-year prison sentence. The fact of the defendant's four-year absence from Lawrence was before the jury, but the reason for it was not.

wrote a love note declaring his romantic feelings for the victim, and left the note at the victim's apartment. During his visits with the victim, Pagan had the opportunity to overhear several arguments between the defendant and the victim conducted by way of Nextel cellular telephone,[2] including one argument in which Pagan heard the defendant threaten the victim by saying, "If I catch you with another man or something, I'm going to kill you."

In the months leading up to the victim's death, the defendant spent a great deal of time at an apartment in Lawrence,[3] where Jeanette DeLeon (Jeanette DeLeon) lived with her brother, Jose DeLeon (DeLeon), her two young children, her friend Xihomara Vargas, and Vargas's child. Danielle Moschetto, who was the defendant's girl friend during the three months before the victim's murder, also spent significant time at the DeLeons' apartment. Moschetto, the DeLeons, and the defendant had grown up together and at the time of the murder had known each other for several years. Approximately one month before the victim's murder, the defendant told Moschetto that he was going to "terminate" the victim, but did not provide details.

On February 24, 2008, the day of the homicide, the victim picked up Pagan to run errands in the morning, and then drove Pagan to Pagan's girl friend's house. The victim's roommate Gil and the victim had planned to spend the afternoon moving a couch from the home of the defendant's mother, but Gil failed to secure a moving van. Gil last spoke to the victim sometime between 4 and 5 P.M.

At 4 P.M. on February 24, all the residents of the DeLeons' apartment were home. DeLeon was planning to go to Haverhill by train to visit his girl friend. Sometime after 4 P.M., the defendant telephoned DeLeon and asked him to remain at the apartment so the defendant could join him to smoke marijuana.

---

[2]Nextel cellular telephones have a "direct connect" feature enabling them to be used like "walkie-talkies," in that they allow multiple persons to hear the caller on the other end of the conversation without actually answering or responding to the call. See Commonwealth v. Williams, 456 Mass. 857, 859 n.1 (2010). A Nextel cellular telephone also displays the caller's telephone number and the name associated with that number.

[3]The victim's apartment in Methuen was on the same street and approximately one and one-half miles away from this apartment.

The defendant also told DeLeon that he would "get [DeLeon] a ride" to Haverhill. Thereafter, the defendant arrived at the apartment and went with DeLeon into the bedroom to prepare the marijuana to smoke, but they were interrupted when the defendant received a call on his Nextel cellular telephone just after 8:30 P.M., inferably from the victim.[4] Before leaving the DeLeons' apartment, the defendant told DeLeon, "I can get you a ride. Just stay here, I don't want you to be scared." The defendant did not return to the DeLeons' apartment for approximately one hour. After telephoning the DeLeons four separate times and instructing DeLeon to meet him behind the apartment building, the defendant then suddenly appeared at the front door of the apartment wearing a black jacket with the hood over his head, black gloves, and a cap, and looked "shook up" and "in a rush." He quickly left the apartment through the back door.

DeLeon and the defendant then met outside the apartment building and got into what turned out to be the victim's brown or gold Toyota Camry. DeLeon had never seen the defendant, who did not have a license, drive this vehicle before. DeLeon asked the defendant to drive him to Haverhill to visit his girl friend. The defendant indicated he did not intend to drive to Haverhill, handed DeLeon the keys to the vehicle, and told him to return it by the next day, Monday.

At around 10:30 P.M. that night, Gil returned with his friend Jeffrey Hernandez to the apartment he shared with the victim. Gil noticed on arrival that the victim's car was not parked in its usual space outside the building. On entering the apartment, he observed that its condition was largely as he had left it with the exception of two video game consoles that he discovered were missing from his bedroom and a knife missing from the kitchen counter. The door to the victim's bedroom was closed, and the lights were on. When Gil opened the door to that room, he discovered the victim lying in a pool of blood on the floor at the foot of the bed wearing only a T-shirt and socks. Gil immediately left the apartment to rejoin his friend Hernandez, and telephoned the Methuen police.

---

[4] Records of the victim's Nextel cellular telephone indicated that he had initiated a series of calls to the defendant's telephone at 8:39, 8:41, and 8:49 P.M.

Police arrived at the apartment soon after 10:37 P.M. Officer Christine Nicolosi of the Methuen police discovered the victim unresponsive with stab wounds to his back and left arm. Paramedics arrived and pronounced the victim dead. An autopsy later indicated that the victim died from twenty stab wounds, including wounds that penetrated the chest and liver.

Crime scene investigators from the State police crime laboratory (crime lab) responded to the scene and discovered passive drops of human blood on the victim's back, on the floor next to his body, and on a dresser, bedspread, and interior side of the closet door. The victim's genital area, his T-shirt, the rug, and the bedspread tested positive for semen.

The following day, February 25, a State police trooper saw DeLeon driving a car matching the description of the vehicle stolen from the victim, and stopped it. When asked by the trooper where he had obtained the vehicle, DeLeon did not mention the defendant's name but told the officers he received the vehicle from "John Torres." DeLeon was arrested for receiving a stolen motor vehicle. When the defendant learned from DeLeon's former girl friend that the police had arrested DeLeon, the defendant instructed her to tell DeLeon to lie and inform the police that DeLeon had found the keys in the vehicle, and not to mention the defendant's involvement.[5]

Police officers investigating the homicide contacted the defendant. On three separate occasions, the defendant waived his Miranda rights and agreed to be interviewed by State police Trooper Brandon Arakelian; these interviews occurred on February 25, February 26, and May 29, 2008. During the first interview, the defendant admitted that the victim was his "best friend," but denied having engaged in a "romantic" relationship with him. The defendant told Trooper Arakelian that he last saw the victim on Saturday, the day before the murder, with a friend of the victim named "Red." During the next two interviews, the defendant increasingly admitted to carrying on a casual sexual relationship

---

[5]A forensic chemist employed by the State police crime laboratory (crime lab) tested DeLeon, the passengers in the car with him, and the interior of the car for the presence of blood. The testing revealed that the interior contained visible and occult blood, but the blood was not human blood. The testing also revealed that DeLeon's hands tested positive for blood, but the crime lab did not conduct further testing of the sample.

with the victim and revised a number of times his account of his activities on the day the victim was killed. However, the defendant maintained consistently that he was not involved in the victim's death.

After the second interview on February 26, Arakelian seized a black jacket, jeans, a belt, boots, a black tank top, a white T-shirt, a long-sleeved shirt, a baseball cap, two socks, and boxer shorts from the defendant. A forensic chemist at the crime lab performed a screening test for blood on the clothes; the interior hood of the defendant's jacket, the T-shirt, tank top, boots, and belt buckle all tested positive for human blood. Another chemist in the crime lab examined the defendant for the presence of blood, and a screening test of the defendant's hands returned positive results for the presumptive presence of blood. Gil's and Hernandez's hands were also tested, and tested negative for blood. Also on February 26, the State police applied for and obtained a search warrant for the defendant's apartment in North Andover.

The Commonwealth also introduced DNA evidence as part of its case-in-chief. Over the course of the investigation, investigators employed by the crime lab had collected DNA samples from six different individuals: Pagan, DeLeon, Gil, Hernandez, the defendant, and the victim. Comparisons between the evidentiary DNA samples obtained from items secured during the investigation and the known DNA samples of these individuals indicated that the defendant's socks and the interior of the hood of the defendant's jacket contained DNA matching that of the victim. We discuss additional background facts in connection with specific claims raised by the defendant.

*Discussion.* 1. *Partial denial of the defendant's motion to suppress.* The defendant argues that the motion judge, who was also the trial judge, erred in partially denying his motion to suppress evidence the police seized from the defendant's apartment in a search conducted pursuant to a warrant. He claims that the search warrant application and accompanying affidavit clearly indicate that the focus of the proposed search was on evidence connected to the killing of the victim, and not on a separate crime of armed robbery. Therefore, because the judge determined that the affidavit did not establish probable cause to link the

defendant or his North Andover apartment to the victim's death and the related crime scene in Methuen, all items seized from the defendant's apartment were required to be suppressed, including the bloodstained sock (referred to by the judge and the parties as "the bloody sock") that the judge allowed to be introduced in evidence. The defendant further contends that, in any event, the judge was required to hold an evidentiary hearing to resolve the factual issue whether the sock seized from the defendant's bedroom was, in fact, bloody. We disagree with both claims.

The background facts pertinent to these claims are as follows. On February 26, 2008, Trooper Anthony Schena, III, of the State police submitted an application for a search warrant to search the defendant's apartment in North Andover and a supporting affidavit. The affidavit included the following information. On February 24, the Methuen police received a report of the victim's stabbing, which led them to the victim's apartment. They found there the victim as well as letters signed by "Joker," a known "street name" of the defendant; a job application in the defendant's name; and an unsigned love letter. The medical examiner who conducted the autopsy reported the manner of the victim's death as homicide and cause of death as multiple stab wounds. On February 26, three women — Moschetto, Jeanette DeLeon, and Vargas — went to the police department and provided a report concerning the defendant's activities on February 24, the day of the homicide. They told the police that the defendant had visited DeLeon at the DeLeons' apartment, had said to DeLeon to wait for the defendant at the apartment so that DeLeon "wouldn't be scared," left the apartment for approximately forty-five minutes, and returned in a panicked state. The three women also reported that on the day before the homicide, February 23, the defendant had arrived at the apartment "covered in blood," and told them that he had lost the magazine from his gun while robbing a person in front of a liquor store in Lawrence; and that the defendant had disposed of the bloody clothes in a dumpster behind the apartment building. The Lawrence police recovered a bloody jacket and gloves from that dumpster. Also on February 26, the Lawrence police arrested the defendant, "based on probable cause developed

during their investigation, which include[d] an [eyewitness's] positive[] identification."[6,7]

Based on this information, the affidavit stated, the police requested a warrant to search the defendant's apartment for the following:

> "blood, blood stains, blood spatter, physiological fluids, hairs, fibers, weapons and firearms, including pistols, rifles, revolvers, shotguns, . . . projectiles, ammunition, bullet casings and fragments, dirt, dust, and soil, paint samples, glass and plastic fragments, keys, marks of tools used to gain access to locked premises or containers and items containing traces of any of the above-mentioned articles. Any and all trace evidence, and articles of clothing as described in the aforementioned affidavit, any and/or all bloody clothing, [and] any bloody footwear, . . . notes, newspaper articles, and writings, any and all correspondence, including hand written letters, between the victim, William Escobar, and Christian Almonte. Any and all photographs of Christian Almonte and William Escobar, jointly or individually. Any video game systems fitting the description given by the victim's roommate as described above."

The search warrant issued on February 26, and the State police executed it that day. They seized one pair of socks[8] with red-brown stains from the bedroom of the apartment, several jackets, and a video game console. The police also seized over one hundred letters between the defendant and the victim sent during the defendant's four-year absence.

After two hearings, the judge denied the motion in part and

---

[6]The affidavit did not identify the charge on which the Lawrence police arrested the defendant, but the reasonable inference is that the crime was the armed robbery referenced by Moschetto, Jeannette DeLeon, and Vargas.

[7]The affidavit also stated that on February 25, DeLeon was arrested while driving a vehicle owned by the victim; the vehicle contained blood stains.

[8]It appears from the record that the inventory sheet completed after the State police executed the search contained an error and included only one pair of socks. At trial, a crime scene investigator employed at the crime lab testified that she recovered four white socks from the bed in the bedroom. This error is of no consequence to our analysis.

allowed it in part.[9] He ruled that the search warrant affidavit failed to show a sufficient nexus between the defendant or his apartment and the homicide. The judge concluded, however, that the affidavit did contain enough information to believe that items connected to the armed robbery reported by the three women and investigated by the Lawrence police would be found in the apartment, and specifically established probable cause to search the apartment for blood that the defendant was likely to have transferred there on his person, as well as trace evidence from the armed robbery. Based on these determinations and on his ruling that the invalid portion of the search warrant was severable from the rest, the judge ordered suppressed all the evidence seized that was exclusively connected to the homicide investigation — including the video game console, the box of letters, and the jackets lacking any indication that blood would be found on them — and denied the defendant's motion with respect to the bloody sock.[10]

There was no error. "An affidavit must contain sufficient information for an issuing magistrate to determine that the items sought are related to the criminal activity under investigation, and that the items reasonably may be expected to be located in the place to be searched at the time the search warrant issues." *Commonwealth* v. *Wilson*, 427 Mass. 336, 342 (1998), citing *Commonwealth* v. *Cinelli*, 389 Mass. 197, 213, cert. denied, 464 U.S. 860 (1983). Trooper Schena's affidavit reasonably can be read to indicate that as of its date, February 26, 2008, officers

---

[9]After hearing initial argument on the defendant's motion to suppress, the judge ordered an additional hearing and for the parties to brief two additional issues: (1) whether the search of the defendant's apartment was constitutional in the event that the search warrant affidavit demonstrated valid probable cause to search for evidence of the armed robbery but not probable cause to search for evidence of the homicide; and (2) if so, whether an evidentiary hearing was required as to the scope of the search for evidence. The parties filed the additional memoranda, and the judge thereafter issued his ruling orally.

[10]The judge stated:

"Where the police had constitutional justification to be where they were and constitutional justification to seize what they seized, based on the four corners of the affidavit, it makes no sense to [suppress] that evidence, the bloody sock, simply because that bloody sock is now being used as part of the murder prosecution."

from the Lawrence police department and the State police simultaneously were conducting two separate investigations, one into an armed robbery and one into the victim's death. It is true that Schena and the State police were focused on the homicide in Methuen while the Lawrence police apparently were focused on the armed robbery. But this does not change the fact that the robbery was under investigation by police and was specifically referred to in Schena's affidavit, and that the scope of items for which the search warrant was sought included items that were clearly connected to a robbery at gunpoint rather than a homicide by stabbing.[11]

As for the bloody sock itself, the judge properly concluded that given the information reported by the three women about the defendant's blood-covered appearance and his statement about having just tried to rob someone — information that the Lawrence police corroborated — it was reasonable to believe clothing and other items having blood on them would be located at the defendant's apartment. See *Commonwealth* v. *Cavitt*, 460 Mass. 617, 626-627 (2011) (probable cause sufficient to search apartment for trace evidence of blood and bodily fluids transferred onto defendant's clothing and shoes after armed robbery turned violent). A sock with possible blood stains on it had a sufficient nexus to the robbery to warrant its seizure.

The defendant's second argument concerning the motion to suppress focuses on the bloody sock itself. He claims that an evidentiary hearing was necessary to consider whether the sock was indeed bloody, because nothing in the affidavit addressed the point. The claim fails. As just discussed, the affidavit provided probable cause to search for items that might have blood transferred to them in connection with the robbery. Implicit in the judge's ruling on the motion to suppress is that the particular

---

[11]The judge was correct in ruling that the insufficient or invalid portion of the affidavit — the portion purporting to establish probable cause to search the defendant's apartment for evidence of the victim's killing — could be severed from the valid portion. Cf. *Commonwealth* v. *Tyree*, 455 Mass. 676, 692-693 (2010) (court assessed adequacy of search warrant affidavit after excluding all information obtained from impermissible source; affidavit with exclusions established probable cause for search, and evidence seized was properly admitted).

sock at issue suggested that there would be blood on it.[12] Whether or not blood was in fact found to be present on the sock is not the issue — although, as the Commonwealth points out, the sock in question had tested positively for blood before the defendant was even indicted. Accordingly, even if the judge had held an evidentiary hearing, the evidence at the hearing would have confirmed that the sock contained blood. The failure to hold an evidentiary hearing did not prejudice the defendant.

2. *Prosecutor's opening statement.*[13] The defendant contends the prosecutor's opening statement to the jury improperly expressed the prosecutor's personal opinion on the critical issue at trial — whether the defendant murdered the victim — and created a substantial likelihood of a miscarriage of justice. There was no impropriety.

The prosecutor began his opening statement by telling the jury that "[o]n February 24th of 2008, the defendant, Christian Almonte, murdered William Escobar in Escobar's Methuen apartment." The prosecutor's remark was not an expression of personal opinion. Rather, it appears to be a restatement of what the indictment charged, and what the Commonwealth would seek to prove beyond a reasonable doubt at trial — in other words, a summary of the Commonwealth's thesis in prosecuting the case. In the remainder of the prosecutor's opening statement, the prosecutor highlighted the evidence that would be presented to support that thesis, and concluded by reiterating the Commonwealth's position that the defendant was guilty.[14]

Moreover, the judge's instructions would have cured any pos-

[12]We reach this conclusion because the judge suppressed other clothing items found in the apartment "that did not suggest that there would be blood on [them]." Moreover, the fact that the socks seized from the defendant's apartment featured red-brown stains was not in dispute.

[13]The defendant presents as one argument his claims of improper opening statement and improper closing argument on the part of the prosecutor. However, the defendant's claim concerning the closing argument focuses particularly on the prosecutor's statement about the testimony of the Commonwealth's deoxyribonucleic acid (DNA) analyst, which is also the subject of a separate claim by the defendant. We consider both claims about the analyst's DNA testimony in the next section of this opinion.

[14]The prosecutor remarked in conclusion, "I'm going to ask you to return a verdict of guilty of murder in the first degree and guilty of larceny of a motor vehicle."

sible misunderstanding of the challenged statement. Before the prosecutor made his opening statement, the judge told the jury that opening statements were not evidence, but rather an overview of the evidence the jury would hear during trial, and repeated that instruction after both sides completed their openings and as part of his final charge.

3. *Testimony concerning inconclusive results of certain DNA testing.* The defendant argues that the admission of a nonresponsive answer provided by the Commonwealth's DNA analyst, stating that the results of DNA testing of blood on the defendant's hands "could kind of go either way as far as [the victim's DNA] being there," and the failure of the judge to strike the testimony or give a curative instruction, created a substantial likelihood of a miscarriage of justice and deprived the defendant of his constitutional due process and fair trial rights. The defendant further contends that the prosecutor's statement during his closing argument that the victim could not be excluded as a source of the blood found on the defendant's hands was factually inaccurate, misled the jury, and created a separate substantial likelihood of a miscarriage of justice.

Kira Snyder, a DNA analyst employed by the crime lab, conducted DNA testing on samples collected by crime scene investigators, and testified as part of the Commonwealth's case. She explained that a number of the DNA samples tested contained a mixture of DNA from at least two different sources. In particular, she testified that the victim's DNA profile matched the major profiles collected from the interior of the hood on the defendant's jacket and from one of his socks; that Pagan, De-Leon, Hernandez, and Gil were all excluded as potential contributors to the minor profile of each; and that the defendant was included as a potential contributor to the minor profile of each.[15] The sample of DNA taken from the sperm found on the victim's T-shirt was also a mixture. The major profile matched the DNA of the victim, and Pagan was included as a potential contributor to the minor profile. DeLeon, Hernandez, Gil, and the defendant were excluded as contributors to the minor profile.

[15]A major profile refers to a single source from which a large amount of DNA is present in the sample, and minor profile refers to a second or additional source that is present in the sample in a lesser amount.

Snyder also testified to the results of the testing on the DNA mixture obtained from blood found on the defendant's hands. The major profile matched the defendant, and Pagan, DeLeon, Hernandez, and Gil were excluded as contributors to the minor profile. The analyst also stated that the "mixture yielded inconclusive results" as to whether the victim was a contributor to the minor profile. In response to the prosecutor's question asking what is meant by the term "inconclusive," the analyst explained that the term indicates "there's not quite enough DNA there to make a conclusion as far as inclusion or exclusion." The prosecutor followed up with a question asking, "But there was enough DNA to exclude the other four people that we've been referring to: Mr. Gil, Mr. Hernandez, Mr. Pagan, and Mr. DeLeon?" In response, the analyst said, "Yes," but then continued, "Essentially, there are certain areas where we expect to see the DNA from given individuals. And at those areas, I did not see the DNA from those four individuals who were excluded. *However, there w[ere] sort of results that could kind of go either way as far as [the victim] being there, which [is] why I said inconclusive*" (emphasis supplied). Defense counsel did not object to this second, nonresponsive extension of the analyst's direct answer of "yes."

During the testimony of the next witness, the judge brought up the propriety of the extended answer in a sidebar discussion with counsel. He expressed a concern that the analyst's answer was nonresponsive and might mislead the jury into thinking that "inconclusive" meant "that there was enough information where you could say, yeah, it could have been him or it might not have been him, it was too close to call, it could go either way." Defense counsel admitted he "didn't pick up on it," and that his failure to object was not a strategic decision. Neither attorney expressed a clear position whether further instruction was required, and the judge decided to determine later that day what, if any, remedial action to take. At a subsequent sidebar conference, defense counsel asked the judge to strike the part of the analyst's answer to the effect that the results may "go either way." The judge declined to do so. Agreeing with the prosecutor, he stated that to do so would make a "bigger issue of [the analyst's answer] than it is," and any prejudice would be minimal

as long as the prosecutor did not argue that the significance of the inconclusive result was that it was a "close call" whether the sample from the victim matched the sample from the defendant's hands.[16]

In their closing arguments, both the defendant's counsel and the prosecutor referenced the DNA evidence. The prosecutor argued generally that the forensic evidence recovered from the scene implicated the defendant and, specifically with respect to the blood found on the defendant's hands, stated: "The defendant had blood on his hands. Whose blood was it? Well, it wasn't Johnny Pagan's. It wasn't Jose DeLeon's. It wasn't Jeffrey Hernandez. It wasn't Alberto Gil. The only person that was tested that couldn't be excluded, William Escobar." Defense counsel did not object.

We consider first the DNA analyst's trial testimony. We have recognized that DNA test results are inconclusive if they provide no information to include or exclude a person because of an insufficient sample or some other reason. See *Commonwealth* v. *Mathews*, 450 Mass. 858, 864 (2008) (explaining significance of inconclusive result, DNA analyst testified that "there was just not enough DNA information in the DNA profile . . . to either include or exclude those two individuals"). See also *Commonwealth* v. *Mattei*, 455 Mass. 840, 853 (2010). This court grants significant deference to the trial judge's determination on the relevance of such testimony, and a prosecutor is entitled to introduce testimony that the DNA tests performed yielded inconclusive results as probative of the adequacy of the criminal investigation where, as in this case, adequacy is in issue. *Commonwealth* v. *Mathews*, *supra* at 872 & n.15. Accord *Commonwealth* v. *Fitzpatrick*, 463 Mass. 581, 601 (2012). Cf. *Commonwealth* v. *Cavitt*, 460 Mass. 617, 634-635 (2011). The concern here is not the propriety of introducing evidence that the result of the DNA testing from blood on the defendant's hands was inconclusive as to the victim; the defendant agrees that the evidence was admissible in the circumstances of this case, and we agree as well. Rather, the issue is whether admission of the analyst's unobjected-to but nonresponsive answer

---

[16]The prosecutor agreed not to mention the statement that the testing results relating to the victim "could have gone either way" in his closing argument.

purporting to further explain what "inconclusive" meant in this context — and in particular the comment that the results of the testing "could go either way" in relation to the victim's inclusion in the sample — was error creating a substantial likelihood of a miscarriage of justice. We conclude that the analyst's comment had the potential of confusing or misleading the jury in the way the judge described and that striking the comment would have been appropriate. However, in all the circumstances, the admission of the challenged comment did not create a substantial likelihood of a miscarriage of justice.

The analyst's challenged comment must be considered in context. In response to the prosecutor's initial question asking what "inconclusive" means, the analyst gave an answer that was straightforward and correct: the DNA available for testing was insufficient in amount to include or exclude the person of concern — here, the victim. The challenged comment followed this correct response as one piece of the analyst's answer to the prosecutor's next question. Moreover, the challenged comment itself was one part of a somewhat awkwardly phrased attempt by the analyst to explain why the DNA sample material could be sufficient to exclude certain individuals but insufficient to exclude others, and the jury may well have understood it as such. To the extent the jury instead may have understood the comment as suggesting that whether the victim's DNA was present on the defendant's hands was, as the judge put it, "too close to call" but nonetheless possible, the testimony would have been essentially cumulative: there was other, unchallenged evidence properly before the jury of testing indicating that the victim's DNA was present on the defendant's sock and the interior of the hood of his jacket. In the circumstances, the brief, ambiguous comment by the analyst did not prejudice the defendant in a manner requiring reversal of his murder conviction.

We turn to the prosecutor's closing argument. Insofar as the prosecutor told the jury, in discussing the DNA testing of the blood on the defendant's hands, that the victim was "the only person [who] was tested that couldn't be excluded," the statement was improper. Whether or not DNA test results fail to exclude a person as a potential contributor to sample material poses a wholly different question from whether the test results

are inconclusive, see *Commonwealth* v. *Mattei*, 455 Mass. at 853-854, and there was no evidence introduced at trial that the victim could not be excluded. Moreover, evidence that a particular person cannot be excluded as a potential contributor may not properly be introduced without being accompanied by reliable statistical evidence explaining the likelihood that other individuals in a given population also could not be excluded. See *id.* at 851-853. There was no such evidence introduced in this case.[17]

Nevertheless, we are persuaded that the improper remark by the prosecutor, unobjected to by the defendant's counsel, did not create a substantial likelihood of a miscarriage of justice. The remark was a single statement in a comprehensive closing argument; at several junctures during the trial and particularly in his final charge, the judge instructed the jury that closing arguments are not evidence, that the jury were required to decide the case based only on the evidence, and that their collective memory of the actual evidence was controlling. Further, the evidence indicating the defendant had killed the victim was very strong, and as mentioned, there was properly admitted evidence before the jury that affirmatively linked the victim to the DNA sample materials taken from the defendant's sock and jacket, so that the prosecutor's argumentative statement was cumulative.[18] Cf. *Commonwealth* v. *Buckman*, 461 Mass. 24, 38-39 (2011), cert. denied, 132 S. Ct. 2781 (2012).

4. *Limitation of cross-examination of DeLeon.* The defendant argues that he was improperly prevented from inquiring, during his cross-examination of DeLeon, into the facts of three prior convictions bearing on DeLeon's veracity. He urges this court

---

[17]We do not intend to suggest here that the prosecutor intentionally misstated the evidence. It bears noting that this court's decision in *Commonwealth* v. *Mattei*, 455 Mass. 840 (2010), was issued almost one year after the trial in this case.

[18]We do not agree with the Commonwealth's contention on appeal that the jury could permissibly infer that *any* blood found on the defendant's hands was the victim's, and that therefore there was no error here. The cases on which the Commonwealth relies for this point, see *Commonwealth* v. *Voisine*, 414 Mass. 772, 781-782 (1993); *Commonwealth* v. *Beldotti*, 409 Mass. 553, 561-562 (1991); *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 744-745 (1990), did not involve DNA testing. It is inappropriate to rely on them in the context of a case where DNA testing and the meaning of its results are centrally at issue.

to adopt rule 608(b) of the Federal Rules of Evidence, a rule that permits the scope of permissible cross-examination to include evidence and inquiry relating to the facts of specific instances of prior misconduct on the part of a witness, for the purpose of attacking or supporting the witness's character for truthfulness.

The general rule in the Commonwealth is that a party may impeach a witness by attacking the witness's character for truthfulness, but only through general reputation evidence, or evidence of a witness's prior criminal convictions in conformity with the requirements of G. L. c. 233, § 21. See, e.g., *Commonwealth* v. *Daley*, 439 Mass. 558, 563 (2003). Individual bad acts of untruthfulness are for the most part inadmissible to impeach a witness. *Commonwealth* v. *Olsen*, 452 Mass. 284, 293 (2008). See Mass. G. Evid. § 608(a) (2012). By contrast, under Fed. R. Evid. 608(b), a party on cross-examination of a witness may inquire into the details of prior instances of misconduct if probative of the witness's character for veracity.

We decline to accept the defendant's invitation to use his case as a vehicle to abandon our long-standing limitation on the type of admissible evidence of untruthful character and to adopt in substance the rule set out in Fed. R. Evid. 608(b). Although there may be other reasons to decline to adopt the rule, it suffices to say that we reach this result here because it is clear that the expanded rule would add little or nothing to the defendant's case. The defendant's counsel extensively impeached DeLeon concerning his lies to the police about the car and the mythical "Johnny Torres" who allegedly loaned the car to him — that is, even without the benefit of a changed rule, counsel was able to focus on the specific facts of an instance of untruthful conduct. In addition, DeLeon admitted during cross-examination to twelve prior criminal convictions, and the judge explained in his final jury charge that the jury were specifically entitled to use this extensive evidence in connection with assessing DeLeon's credibility. In very limited circumstances, this court has permitted inquiry into prior specific instances of untruthfulness to impeach a witness's veracity. See *Commonwealth* v. *Bohannon*, 376 Mass. 90, 93-95 (1978) (defendant charged with rape entitled to impeach complaining witness concerning prior instances of making false allegations of sexual assault where defendant

has factual basis from independent third-party records to do so and certain other conditions are met). Because the benefit to the defendant of an expanded evidentiary rule concerning impeachment on the issue of veracity would be marginal at best, we leave to another day the question whether we should follow the guide of Fed. R. Evid. 608(b), and adopt such a rule more generally.

5. *Admission of death certificate.* The defendant argues that the admission of the unredacted death certificate, which listed the manner of death as "homicide" and described the means of death as "stabbed by other[s]" created a substantial likelihood of a miscarriage of justice and a violation of the defendant's rights to due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.[19] While the preferred practice is to redact the means and manner of death before admitting a death certificate into evidence, see *Commonwealth* v. *Wallace*, 460 Mass. 118, 127 (2011), there was no dispute here that the victim's death was a homicide. We have recognized that admission of such an unredacted death certificate may be error in a case where there is an issue whether the death was a result of an accident or homicide, see *Commonwealth* v. *Tarver*, 369 Mass. 302, 318-319 (1975), citing *Commonwealth* v. *Lannon*, 364 Mass. 480 (1974), but this is not such a case.

6. *Sufficiency of the evidence.* The defendant moved for a required finding of not guilty at the close of the Commonwealth's case and again at the close of all the evidence. The judge denied both motions. On appeal, the defendant challenges the sufficiency of the evidence that the defendant was the person who murdered the victim. We assess whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (emphasis in original). *Commonwealth* v. *Perez*, 460 Mass. 683, 702 (2011), quoting *Commonwealth* v.

---

[19]The defendant makes the same argument in relation to the testimony of the medical examiner that the manner of the victim's death was homicide. To the extent the defendant makes the claim under the Sixth Amendment to the United States Constitution, we note that there could be no claim of violation of the confrontation clause here, because the medical examiner who testified at trial had performed the autopsy of the victim. Contrast, e.g., *Commonwealth* v. *Durand*, 457 Mass. 574, 581 (2010).

*Latimore*, 378 Mass. 671, 677 (1979). Evidence may be primarily or entirely circumstantial provided that the evidence presented is sufficient to persuade "minds of ordinary intelligence and sagacity to the persuasion of [guilt] beyond a reasonable doubt." *Commonwealth* v. *Jansen*, 459 Mass. 21, 27 (2011), quoting *Commonwealth* v. *Latimore, supra.*

The evidence in this case clearly was sufficient to meet the *Latimore* standard. The victim's DNA was present on the defendant's sock seized from his apartment two days after the homicide; the same was true of the inside of the hood of the defendant's jacket. DeLeon, Jeanette DeLeon, and Vargas all testified that the defendant arrived at their apartment in Lawrence during the evening of February 24 to visit DeLeon, left the apartment shortly after receiving a telephone call that the jury could infer was from the victim, and returned in an agitated state about one hour later to meet DeLeon in a Toyota Camry that, it turned out, belonged to the victim. When DeLeon was stopped and arrested by the police while driving the vehicle the next day, the defendant told him through another person to lie about how he obtained the vehicle, and specifically to leave the defendant's name out of the conversation. The defendant had participated in an intimate relationship with the victim extending over a number of years and, it could be found, was jealous of the victim's intimate relationships with other men — jealous to the extent that he threatened to kill the victim. In sum, from all the evidence, including evidence of the distance between the DeLeons' and the victim's respective apartments — about one and one-half miles — a rational jury could find that on the evening of February 24, the defendant left the DeLeons' apartment and walked to the victim's apartment where he killed the victim and stole the victim's automobile.

The defendant's self-serving view of the evidence disregards the well-established principle that motions for a required finding of not guilty must take into consideration the evidence in the light most favorable to the Commonwealth. See *Commonwealth* v. *Latimore*, 378 Mass at 676-677. The judge properly denied the defendant's motions for a required finding of not guilty.[20]

---

[20]At the end of his arguments concerning (1) the prosecutor's opening state-

*7. Review under G. L. c. 278, § 33E.* We have carefully reviewed the record of this case and all the evidence, and find no basis to exercise our authority under G. L. c. 278, § 33E, to set aside or reduce the defendant's conviction of murder in the first degree.

*Judgments affirmed.*

---

ment and closing argument, (2) the judge's refusal to strike the nonresponsive answer of the DNA analyst, and (3) the admission of the unredacted death certificate, the defendant asserts that if this court determines the issue being argued here on appeal not to have been preserved by trial counsel, this court should conclude that the defendant was denied the effective assistance of counsel, and is therefore entitled to reversal of his convictions on that basis. These conclusory assertions hardly qualify as proper argument, but in any event, "[a] claim of ineffective assistance of counsel that has not first been made in a motion for a new trial is the 'weakest form' of such a challenge because 'it is bereft of any explanation by trial counsel for his actions.' " *Commonwealth* v. *Taylor*, 463 Mass. 857, 869 (2012), and cases cited. For the defendant's claims, individually or together, to be successful, counsel's inadequate performance must "appear[] indisputably on the trial record." *Commonwealth* v. *Zinser*, 446 Mass. 807, 811 (2006). It does not do so here.